USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 9-30-2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                   :

THE NASSAR FAMILY IRREVOCABLE    :
TRUST, ALYSE C. NASSAR, ALBERT C.  :
NASSAR, and WORLDWIDE MANAGEMENT  :        __OPINION AND ORDER__
CONSULTANTS, INC.,                    :
                                   :

                 Plaintiffs,    :

                                   :

         - against -           :          13 Civ. 5680 (ER)
                                   :

UNITED STATES OF AMERICA       :

                 Defendant.  :

                                   :
------------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA,     :

                 Plaintiff,     :

                                   :

         - against -           :          13 Civ. 8174 (ER)
                                   :

ALBERT D. NASSAR, individually and as   :
trustee of The Nassar Family Irrevocable Trust, :
THE NASSAR FAMILY IRREVOCABLE   :
TRUST, as nominee for Albert D. Nassar,   :
ALBERT C. NASSAR, ALYCE C. NASSAR,  :
and JOHN DOES 1-10,               :
                                   :

                 Defendants.  :

                                   :
------------------------------------------------------------x

RAMOS, D.J.:

      On August 14, 2013, the Nassar Family Irrevocable Trust (the "Trust"), Alyse C. Nassar

("Alyse"), Albert C. Nassar ("Albert C.") and Worldwide Management Consultants, Inc.

("Worldwide") brought an action claiming that the Internal Revenue Service ("IRS") wrongfully

levied funds in a bank account in the name of the Trust and two bank accounts in the name of

Worldwide (the "Wrongful Levy Action").  On November 15, 2013, the United States of America ("Plaintiff" or the "Government") brought an action to collect the tax liabilities of Albert D. Nassar ("Defendant" or "Nassar") and to enforce tax liens on an apartment owned by the Trust (the "Foreclosure Action").  According to the Government, the apartment is subject to foreclosure on two independent grounds:  (1) the Trust holds it as Nassar's nominee; and (2) the transfer of the apartment to the Trust was a fraudulent conveyance under New York law.

On March 5, 2014, this Court consolidated the Foreclosure Action and the Wrongful Levy Action.  Nassar and the Government have cross-moved for summary judgment in the Foreclosure Action, Docs. 51, 57, and the Government has moved for summary judgment in the Wrongful Levy Action, Doc. 57.[1]  For the reasons set forth below, Nassar's motion is DENIED, and the Government's motions are GRANTED.

## I.   Background

### A.  Factual Background

#### 1.  Nassar's Tax Liability

It is undisputed that Nassar owes the IRS approximately $2.5 million in outstanding personal income taxes, interest, and penalties.  Def. 56.1 ¶ 3; Pl. 56.1 ¶¶1-2, 5.[2]  The IRS made assessments against Nassar for deficiencies in the payment of his taxes in 2002 and 2009, based

---

[1] All "Doc." references are to docket entries in case number 13 Civ. 8174.

[2] The notation "Pl. 56.1" refers to the Government's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, Doc. 59.  The notation "Def. 56.1" refers to Nassar's Rule 56.1(b) Statement of Undisputed Facts, Doc. 54.

Local Civil Rule 56.1(b) governs an opposing party's response to the moving party's 56.1 statement.  In spite of being titled a 56.1(b) Statement, Nassar's Statement was filed prior to the Government's, and therefore was not a response pursuant to 56.1(b).  Because Nassar has failed to file a response, all facts set forth in the Government's statement are deemed admitted in deciding the instant motions.  Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  Still, the Government's assertions must be supported by the record.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2003).

on the self-reported income in his tax returns.[3]  Pl. 56.1 ¶ 1-2.  To cover Nassar's liability from tax year 2002, the IRS recorded a Notice of Federal Tax Lien ("NFTL") against Nassar in New York County on October 4, 2007.  Pl. 56.1 ¶ 6; Declaration of Revenue Officer Deanna DeSilva ("DeSilva Decl."), Doc. 61, Ex. 7 at 1.  A second NFTL was similarly filed on March 19, 2013 to cover Nassar's liability from tax year 2009.  *Id.* at 4.  The IRS subsequently recorded NFTLs against Worldwide and the Trust on July 2, 2013, naming those entities as Nassar's nominees. *Id.* at 2-3; Pl. 56.1 ¶ 7.[4]

Although Nassar has informed the IRS that he intends to pay the amount owed, to this day the IRS has not been able to collect on Nassar's tax liabilities.  Pl. 56.1 ¶¶ 9, 12.  Nassar claims that he has no income, or property, and the IRS has been unable to identify any assets held in Nassar's name that could be used to satisfy his tax liabilities.  *Id.* ¶¶10-11.

### 2.  Nassar's Creation of the Trust and Purchase of the Apartment

In July 2001, Defendant and his former wife, Niliana Nassar ("Niliana"), separated.  Pl. 56.1 ¶ 13.  After the separation, Nassar and Niliana's children, Albert C. and Alyse, lived with

---

[3] The dates and amounts of the deficiency assessments together with the unpaid balances (reflecting assessed interest, penalties, and amounts collected) are set forth in Certificates of Assessments, Payments, and Other Specified Matters ("Forms 4340") provided by the IRS.  Pl. 56.1 ¶¶ 1-2.  The Forms 4340 state as follows:

| Tax Period | Assessment Date | Amount of Deficiency Assessment | Unpaid Assessed Balance |
|---|---|---|---|
| 2002 | 11/17/03 7/19/04 | $1,275,854.00 | $2,496,174.91 |
| 2009 | 2/18/13 | $21,531.00 | $9,986.95 |

*Id.* ¶ 2.  Interest, penalties, and other additions have continued to accrue over time with respect to Nassar's tax liabilities, and thus the full amount of these accruals is not reflected in the Forms 4340, which are limited to the amounts assessed as of March 4, 2016, when the Forms 4340 were generated.  *Id.* ¶ 3.

[4] The federal liens were later erroneously released, but the IRS revoked the releases and reinstated the liens in accordance with statutory requirements.  Foreclosure Action, Dkt. Entry No. 16 at 15-16; DeSilva Decl. ¶ 13.  In denying Defendant's motion to dismiss, the Court found that "the release of the liens neither extinguished [Nassar's] tax liability nor the Government's ability to continue pursuing the [foreclosure] action."  Opinion Denying Motion to Dismiss at 17. The IRS has also filed new NFTLs against Nassar, as well as the Trust and Worldwide as nominees of Nassar.  DeSilva Decl. ¶ 13, Ex. 8.

their mother in Florida before leaving for college.  *Id.* ¶ 14.  Pursuant to a divorce settlement agreed to on November 18, 2003, Nassar was required to pay $3,000 per month in child support payments and $12,000 per month in alimony.  *Id.* ¶ 15.

On July 2, 2001, Nassar and Niliana executed an agreement resulting in the creation of the Nassar Family Irrevocable Trust.  *Id.* ¶ 16.  Nassar and Niliana transferred at least $675,000 to the Trust when it was created in 2001.  *Id.* ¶ 19.  Pursuant to the terms of the Trust agreement, Nassar was appointed as the trustee, and he, Albert C., and Alyse were designated as the beneficiaries.  *Id.* ¶ 17.  Niliana was the settlor, but was granted no control over the Trust.  *Id.* ¶ 18; Declaration of Jeffrey K. Powell ("Powell Decl."), Doc. 62, Ex. 8 at 1-2  ("The Settlor, under no circumstances, shall be entitled to exercise any control, in any manner, over This Agreement or any Trust created hereunder.").  Nassar was given "sole and absolute discretion" as the Trustee to make distributions to the beneficiaries for their "health, support, maintenance and education."  *Id.* at 4.  Furthermore, Nassar was granted discretion to "buy or sell real property" on behalf of the Trust, and to "pay, first from income and then from principal, all costs necessary to maintain any real property held as part of [the Trust]."  *Id.* at 8.  Upon Nassar's death, the Trust's assets are to be passed to Albert C. and Alyse.  *Id.* at 4.

On July 31, 2001, Nassar purchased a one-bedroom condominium located at 845 United Nations Plaza, New York, New York (the "Apartment").  Pl. 56.1 ¶ 22.  Nassar is listed personally as the purchaser of the Apartment on both the condominium deed and the closing statement.  *Id.* ¶ 23.  A check issued from Nassar and Niliana's joint checking account was used to pay for the

approximately $200,000 down payment,[5] and Nassar obtained a mortgage loan in his name for $725,000.  *Id.* ¶¶ 24-25.

On October 15, 2001, Nassar transferred the Apartment by deed to the Trust, and the conveyance was recorded on January 17, 2002.  *Id.* ¶¶ 26, 29.[6]  The Trust provided no consideration for the Apartment, nor did the Trust assume the Apartment's mortgage.  *Id.* ¶ 27.  Rather, Nassar personally paid off the mortgage in full in March 2002.  *Id.* ¶ 28; Def. 56.1 ¶ 11.  In Nassar's mortgage application, he indicated that he intended to use the Apartment as his secondary residence, and in other paperwork completed in connection with the transfer, Nassar notified building management that his personal mailing address was the Apartment's address.  Pl. 56.1 ¶ 30; Powell Decl., Ex. 18 at 1.

Nassar's financial condition at the time of his transfer of the Apartment to the trust is not entirely clear.  However, Nassar reported approximately $12.1 million in income on his tax returns for tax years 1998 through 2001, and paid approximately $4.5 million in federal taxes for those years.  Def. 56.1 ¶ 6.  Furthermore, Worldwide reported over $42 million in gross revenues for tax years 1998 through 2001.  *Id.* ¶ 7.  According to Nassar, Worldwide had a net profit of $12 million over that period, *id.*, though the Government disputes that claim, asserting that Worldwide's tax returns reflect an income of approximately $7.8 million, Pl. 56.1 Response, Doc. 60, ¶ 7.

---

[5] It is not entirely clear what role Niliana played in the Apartment's purchase.  However, the evidence indicates that Nassar was primarily responsible for the purchase, given that he obtained and paid off the mortgage loan, and is listed as the purchaser on the condominium deed and closing statement.

[6] In addition to the Apartment, Nassar has transferred other assets to the Trust, including the furniture in the Apartment (valued at $50,000), the car that he drives (valued at $65,000), and jewelry (valued at $250,000). Pl. 56.1 ¶ 31.

Nassar has resided in the Apartment since his divorce, aside from some hospital stays and a period of incarceration.  Pl. 56.1 ¶ 33; *see* Def. 56.1 ¶ 4 ("[Nassar] is domiciled in the Apartment.").[7]  The insurance policy covering the Apartment lists Nassar personally as the "policyholder."  Pl. 56.1 ¶ 37.  Furthermore, Nassar has paid for the Apartment's insurance, maintenance costs, utilities, and property taxes.  Pl. 56.1 ¶ 36; Def. 56.1 ¶ 15.

Only Nassar has lived in the Apartment, with the exception of his girlfriend, who moved there in 2009.  Powell Decl., Ex. 2 at 26; Powell Decl., Ex. 4 at 31, 37-40.  Albert C. and Alyse have visited Nassar and stayed at the apartment, but have never lived in the Apartment.  Pl. 56.1 ¶¶ 38-39.  There is no evidence in the record of a lease or any other type of agreement between Nassar and the Trust concerning his ongoing use of the Apartment.  Moreover, Nassar has never paid rent to the Trust, nor has he has ever rented the Apartment to generate income for the Trust. *Id.* ¶¶ 34-35.

### 3. The Trust Bank Accounts

Nassar has opened at least four accounts at JP Morgan Chase in the name of the Trust, with himself as the signatory for each of them.  Pl. 56.1 ¶ 42.  On June 3, 2013, the IRS issued a Notice of Levy to JP Morgan Chase identifying the taxpayer as "The Nassar Family Irrevocable Trust as nominee of Albert D Nassar."  *Id.* ¶¶ 40, 43.  On July 10, 2013, the IRS received a

---

[7] *See also* Powell Decl., Ex. 2 (Albert C.'s Deposition Transcript Excerpts) at 16-17, 24-25 (Q: "Is it your understanding that your father lived in the Apartment full time starting after your parents divorced?" A: "Yep."); *Id.* Ex. 3 (Alyse's Deposition Transcript Excerpts) at 19-20, 24, 30, 35 (Q: "Has he [Nassar] resided there [the Apartment] since the separation of your parents? " A: "Yes." Q: "So since the separation of your parents, is it fair to say every time you visit your father you stay with him at that apartment?" A: "Yeah."); *Id.* Ex. 4 (Property Manager John Henriques's Deposition Transcript Excerpts) at 29, 32, 34-35 (Q: "Since you started working in the building in 2004, is it your understanding that Mr. Nassar lived in the apartment all year round?" A: "Yes."); *Id.* Ex. 20 (records reflecting regular delivery of packages to Nassar at the Apartment).

payment of approximately $139,000 from JP Morgan Chase Plus Savings Account No.
XXXXXX6253 (the "Trust Chase Account").  *Id.* ¶¶ 41, 43.

      The Trust Chase Account was opened in April 2009, with only Nassar having access to it.
*Id.* ¶ 43.  Since becoming ill in 2008, Nassar has used Trust funds to cover all of his personal
expenses.  During the period of April 2009 to July 2012 alone, Nassar withdrew approximately
$200,000 from the Trust Chase Account for living expenses.  *Id.* ¶ 46.[8]  Nassar also deposited
checks made out to him personally into the Trust Chase Account.  *Id.* ¶ 45.  For example, on
April 16, 2012, Nassar deposited a check into the account that was made out to him from Blue
Cross Blue Shield for $42,670.50.  DeSilva Decl. ¶ 29.  Meanwhile, Nassar has never maintained
a separate bank account in his name.  Powell Decl., Ex. 1 at 30, 213.

      Nassar has used Trust money for food and groceries, for the garage where he parks his
car, and for his car's insurance.  *Id.* at 40-41; Pl. 56.1 ¶ 47.[9]  Nassar has also repeatedly
transferred money between the Trust Chase Account and a range of other entities that he owned
and controlled.  Pl. 56.1 ¶ 44.[10]

---

[8] As of May 14, 2009, the Trust Chase Account had a balance of $311,587.72, which consisted of funds transferred from two of the other Trust accounts.  DeSilva Decl. ¶ 26.  From April 2009 through July 2012, a total of $199,424.61 had been withdrawn from the Trust Chase Account.  *Id.* ¶ 27.

[9] Nassar claims that the Trust owns the car, though as recently as 2012, the car insurance policy lists Nassar as the "policyholder."  Powell Decl., Ex. 32 at Nass-Supp-REQ005.

[10] For example:

- March 18, 2010: $9,146.33 transfer from Medical Management Holding Corp. to Trust
- March 18, 2010: $7,375.10 transfer from Global Dealmaker LP to Trust
- March 18, 2010: $3,547.15 transfer from Global Players LLC to Trust
- March 18, 2010: $3,031.95 transfer from Global Dealmaker LLC to Trust
- March 19, 2010: $11,666.12 transfer from Global Players LP to Trust
- March 31, 2010: $6,200 transfer from Trust to Worldwide
- April 27, 2010: $19,000 transfer from Trust to Worldwide
- July 21, 2011: $10,000 transfer from Trust to Worldwide
- October 19, 2011: $15,000 transfer from Trust to Worldwide
- December 5, 2011: $15,000 transfer from Trust to Worldwide

Nassar has also used money from the other Trust accounts that weren't levied.  Bank records for Trust accounts that pre-dated the opening of the levied account reveal the transfer of funds to and from Medical Management Corp., a $190,000 payment to the Chicago Title Insurance Company, a $95,000 payment to an entity called Rkr Motors, Inc., and payments for a Citibank Mastercard.  Pl. 56.1 ¶ 48.  In June 2006, Nassar used $24,243.81 from a Trust bank account to purchase season tickets for the Miami Heat basketball team.  Powell Decl., Ex. 33 at CBIZ MHM 001373, 001377.  Nassar used Trust bank account funds in 2007 to pay $50,000 in personal legal fees well before he became ill in 2008.  *Id.* at CBIZ MHM 001379**.**

Nassar has also used Trust account money in business transactions.  In 2009, Nassar transferred $40,000 from the Trust to U.S. Capital Holding, LLC, which Nassar has described as a company "putting a project together in the Middle East."  Powell Decl., Ex. 1 at 179, Ex. 35.  Although Nassar characterized this transfer as a loan from the Trust to the company, the company appears to have only repaid $7,500, in the form of checks made out to Nassar personally.  Powell Decl., Ex. 1 at 179-81; DeSilva Decl., Ex. 18 at GOV 03436, 03440, 03442.  There is no evidence that U.S. Capital Holding, LLC posted security on the purported loan, as required by the terms of the Trust agreement.  Powell Decl., Ex. 8 at 8.

The record indicates that Albert C. and Alyse received little if anything from the levied Trust Chase Account, and neither could identify during their depositions any specific payments they

---

- April 19, 2012: $6,000 transfer from Trust to Worldwide
- June 5, 2012: $6,000 transfer from Trust to Worldwide
- June 29, 2012: $2,700 transfer from Trust to Worldwide
- July 26, 2012: $2,500 transfer from Trust to Worldwide
- August 6, 2012: $500 transfer from Trust to Worldwide

Pl. 56.1 ¶ 44; DeSilva Decl., ¶ 28, Exs. 14, 16, 17.  Nassar has characterized the transfer of funds between the Trust and these entities as "loans."  Powell Decl. Ex. 30 (Worldwide tax return listing $25,200 "note payable" from Trust in Schedule L); Powell Decl., Ex. 28 at CBIZ MHM 001356.  However, there is no evidence of any promissory notes or other documentation indicating that these transfers constituted actual loans.

had received directly from the Trust.  Pl. 56.1 ¶ 53.  Although Nassar used the Trust account to cover his own personal expenses, Nassar failed to make child support payments, resulting in a $113,639.43 child support judgment being filed against him in Florida on June 26, 2012.  *Id.* ¶ 52.

### 4.  The Worldwide Bank Accounts

Nassar is the sole shareholder of Worldwide, as well as its President and Secretary.  Powell Decl., Ex. 38.  In February 2004, Nassar opened an account at Bank of America (Account No. XXXXX0820) in Worldwide's name and listed himself as the sole signatory. DeSilva Decl. ¶ 31 & Ex. 19.  In April 2009, Nassar opened an account at JP Morgan Chase in the name of Worldwide (Account No. XXXXXX3294), again designating himself as the sole signatory.  DeSilva Decl. ¶ 32 & Ex. 20.  On June 3, 2013, the IRS issued a Notice of Levy to Bank of America, identifying the taxpayer as "Worldwide Management Consultants as Nominee of Albert D Nassar."  DeSilva Decl. ¶ 39.  The IRS received a payment in the amount of $427.78 from the levied Worldwide Bank of America account.  Pl. 56.1 ¶ 41.  After the IRS issued the June 3, 2013 Notice of Levy to JP Morgan Chase described above, it received a payment of $13.59 from the Worldwide Chase account.  *Id.* ¶¶ 40-41.  These accounts are collectively referred to as the "Worldwide Accounts."

Nassar was the only one with access to the Worldwide Accounts.  *Id.* ¶ 57.  Nassar utilized these accounts to pay for his personal daily expenses, including the maintenance, insurance, tax, and utility costs for the Apartment, child support payments, garage payments for his car, personal credit card payments, health insurance payments, meals, clothing, gifts for his girlfriend and Albert C., and a payment on his girlfriend's car.  *Id.* ¶ 58.  Nassar acknowledged at his deposition that all of his personal expenses were paid out of the Worldwide accounts.  *See* Powell Decl., Ex. 1 at 201.  Furthermore, Nassar deposited personal checks into these accounts, including refunds from Time Warner, health care reimbursements from Blue Cross Blue Shield, and repayments of personal loans made by him.  Pl. 56.1 ¶ 59.

9

### 5.  Nassar's Past Illegal Conduct

In 2000, a pharmaceutical company filed a civil suit against Nassar, Worldwide, and others alleging that they had wrongfully purchased and re-sold a prescription drug used to treat advanced cancer.  Powell Decl., Ex. 40.  After Nassar represented that he had no assets to pay any judgment in that case, the district court issued an order in April 2001 permanently enjoining him from purchasing, distributing, or selling the drug.  Powell Decl. Ex. 41.  Nassar later pleaded guilty in the Western District of Missouri to charges of conspiracy to sell stolen drugs and criminal contempt (for violation of the April 2001 court order), and on November 30, 2006, was sentenced to five years of probation and ordered to pay $680,000 in restitution.  Powell Decl., Ex. 42.

As a result of separate Florida state charges, the Miami-Dade District Attorney's Office also convicted Nassar on charges of racketeering and trafficking in stolen property, resulting in his incarceration from May 2011 through April 2012.  Powell Decl., Ex. 23 at ¶ 6 n.4.  More recently, in April 2015, Nassar pleaded guilty in the Southern District of Ohio to conspiring to commit mail and wire fraud in connection with a prescription drug diversion scheme, some of the proceeds of which were deposited into one of the Worldwide Accounts.  Powell Decl., Ex. 43; DeSilva Decl. ¶ 37 & Ex. 26 (checks from co-conspirator Dr. Michael Schoenwald).  Nassar is awaiting sentencing for these latest charges.  Plaintiff's Memorandum of Law in Opposition, Doc. 58, at 18.

## B.  Procedural History

On August 14, 2013, the Trust, Albert C., Alyse, and Worldwide filed the Wrongful Levy Action pursuant to 26 U.S.C. § 7426.  They sought a temporary restraining order and preliminary injunction that would have, *inter alia*, required the IRS to return the levied funds and prohibited the IRS from seeking to seize the Apartment.  13 Civ. 5680, Doc. 1.  On October 23, 2013, this Court denied the preliminary injunction motion in its entirety.  *Id*.

On November 15, 2013, the Government filed the Foreclosure Action to (1) reduce to judgment Nassar's federal tax liabilities for tax years 2002 and 2009 and (2) foreclose the federal tax liens upon the Apartment.  By Order dated March 5, 2014, the Court consolidated the Foreclosure Action and the Wrongful Levy Action.  Doc. 10.

On January 13, 2016, Nassar moved for summary judgment with respect to the foreclosure action.  Doc. 51.  On March 14, 2016, the Government cross moved for summary judgment with respect to the Foreclosure Action, and moved for summary judgment with respect to the Wrongful Levy Action.  Doc. 57.

## II.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

(quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in

opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d

14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To defeat a motion for summary judgment, "the non-moving party must set forth significant,

probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F.

Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III.   Discussion

Section 6321 of the Internal Revenue Code states that "[i]f any person liable to pay any

tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of

the United States upon all property and rights to property, whether real or personal, belonging to

such person." 26 U.S.C. § 6321. "A tax lien arises automatically at the time of the assessment

and continues thereafter until the underlying tax liability is satisfied." *Magesty Secs. Corp. v.

U.S. I.R.S.*, No. 10 Civ. 638 (ALC), 2012 WL 1425100, at *3 (S.D.N.Y. Apr. 24, 2012). The

language in Section 6321 "is broad and reveals on its face that Congress meant to reach every

interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce*, 472

U.S. 713, 719-20 (1985). The United States may bring suit to enforce a federal tax lien or "to

subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or

interest" to the payment of the tax. 26 U.S.C. § 7403(a).

### A.  The Apartment Foreclosure

The Government asserts that the Apartment is subject to foreclosure because the Trust holds it as Nassar's nominee, and because the transfer of the Apartment to the Trust was a fraudulent conveyance under New York law.  Nassar claims that the Trust was created for estate planning purposes, and for the purpose of passing down the property to his children after his death.  Nassar further asserts that the Apartment is not subject to foreclosure because it was not acquired in anticipation of significant financial liabilities, actual consideration was paid for the Apartment, and the Government cannot prove an actual intent to defraud the Government. Nassar also contends that the statute of limitations bars the Government's fraudulent conveyance claim.

The Court finds that the record demonstrates that Nassar transferred the Apartment to the Trust as his nominee, and that therefore the Government is entitled to foreclose its tax liens on the Apartment.[11]

### 1.  Nominee Liability Standard

"Under the nominee doctrine, an owner of property may be considered a mere 'nominee' and thus may be considered to hold only bare legal title to the property." *United States v. Snyder*, 233 F. Supp. 2d 293, 296 (D. Conn. 2002).  The "critical issue" in the nominee analysis is "not motive, but control, and whether the defendant used this control to commit a fraud or other wrong resulting in an unjust loss or injury to the plaintiff." *United States v. Everoff*, 270 F. App'x 75, 77 (2d Cir. 2008) (citing *In re Vebeliunas*, 332 F.3d 85, 91-92 (2d Cir. 2003)).  A nominee finding does not require intent to defraud creditors or hinder collection efforts. *United*

---

[11] Because the Court finds for the Government on the nominee theory, it need not consider the Government's fraudulent conveyance claim.

*States v. Evseroff*, No. 0 Civ. 6029 (KAM), 2012 WL 1514860, at *10 (E.D.N.Y. 2012) (citing *In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999)).  In discerning whether a nominee relationship exists, the question is "whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *Id.* at *9 (quoting *In re Richards*, 231 B.R. at 578).

In determining whether a taxpayer holds a piece of property as a nominee, many federal courts apply a six-factor test, which involves determining:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Evseroff*, 2012 WL 1514860, at *10 (quoting *Giardino v. United States*, No. 96 Civ. 6348 (T), 1997 WL 1038197, at *2 (W.D.N.Y. Oct. 29, 1997)); *see also First Corporate Sedans, Inc. v. United States*, No. 94 Civ. 7642 (DC), 1996 WL 145958, at *4 (S.D.N.Y. Apr. 1, 1996) (invoking the six-factor test in denying taxpayer's request for a preliminary injunction to prevent government from levying assets based on the nominee theory).

A court should "avoid an over-rigid preoccupation with questions of structure, and apply the preexisting and overarching principle that liability is imposed to reach an equitable result." *Magesty Sec. Corp.*, 2012 WL 1425100, at *4 (quoting *LiButti v. United States*, 107 F.3d 110, 119 (2d Cir. 1997)).  The inquiry should be aimed at determining whether the taxpayer "exercised active or substantial control over the property." *Evseroff*, 2012 WL 1514860, at *10

14

(quoting *In re Richards*, 231 B.R. at 579).  Accordingly, courts evaluate the totality of the circumstances; "no single factor is dispositive." *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1070 (9th Cir. 2013) (citing *Dalton v. C.I.R.*, 682 F.3d 149, 158 (1st Cir. 2012)).

Ultimately "state law controls in determining the nature of the legal interest which the taxpayer had in the property." *Nat'l Bank of Commerce*, 472 U.S. at 722 (internal quotation marks and citations omitted).  New York state courts have not explicitly applied the nominee theory of ownership in tax cases.  However, courts have found that New York law recognizes the equitable principles that underlie the nominee theory.  *See United States v. Cohn,* 682 F. Supp. 209, 216 (S.D.N.Y. 1988) (finding that under New York law, courts may invoke their "equitable power to disregard the formality of legal title to the property in order to achieve a just result."); *see also Magesty Secs. Corp.*, 2012 WL 1425100, at *4 ("[I]n actions seeking to establish that a taxpayer possessed an ownership interest in property levied upon by the IRS, 'New York law permits a court to disregard the corporate form whenever necessary to prevent a fraud or to achieve equity.'") (quoting *Cohn*, 682 F. Supp. at 216); *Gerder Servs. Inc. v. Johnson*, 439 N.Y.S.2d 794, 796 (Sup. Ct. Erie Cty. 1981) ("Equity historically has placed substance above form . . . .").  Furthermore, courts in this Circuit have applied the nominee theory in tax cases where the property interest was governed by New York law.  *See Evseroff,* 2012 WL 1514860, at *10; *Cohn*, 682 F. Supp. at 216; *Magesty Secs. Corp.*, 2012 WL 1425100, at *4.[12]

---

[12] Indeed, in *United States v. Evseroff*, 270 F. App'x 75, 78 (2d Cir. 2008), the Second Circuit remanded to the district court so it could reconsider the government's nominee theory under New York law.  The Circuit noted: "In rejecting the government's claim that Evseroff was the nominee or alter ego of the trust, the district court relied, at least in part, on its finding as to Evseroff's estate planning motive.  Under New York law, however, the critical issue in resolving a nominee or alter ego claim is not motive, but control, and whether the defendant used this control to commit a fraud or other wrong resulting in an unjust loss or injury to the plaintiff." *Id.* at 77.  Upon reconsideration, the district court found that the trust was in fact Evseroff's nominee, and that Evseroff had fraudulently conveyed the subject property to the trust.  The Second Circuit affirmed the district court's holding with respect to the fraudulent conveyance theory, but then found that that it need not consider the other grounds for the district court's holding, including the nominee theory.

Where state law does not explicitly set forth a nominee test, federal courts have looked to the factors applied by other courts to determine whether a nominee relationship exists. *See, e.g.*, *United States v. Capriotti*, No. 11 Civ. 847, 2013 WL 1563214, at **25-26 (E.D. Ca. Apr. 12, 2013); *Sharp Mgmt., LLC v. United States*, No. 7 Civ. 402 (JLR), 2007 WL 1367698, at *3 (W.D. Wash. May 8, 2007); *May v. A Parcel of Land*, 458 F. Supp. 2d 1324, 1337 (S.D. Ala. 2006); *Cody v. United States*, 348 F. Supp. 2d 682, 694-95 (E.D. Va. 2004); *LiButti v. United States*, 968 F. Supp. 71, 75 (N.D.N.Y. 1997), *rev'd in part on other grounds*, 178 F.3d 114 (2d Cir. 1999). Thus, the Court finds it appropriate to apply the six-factor nominee test as guidance for the Court's analysis. *See Magesty Secs. Corp.*, 2012 WL 1425100, at **4-5 (assessing factors such as consideration paid, anticipation of liability, and retention of control after acknowledging that New York law governed the nature of the taxpayer's interest in the property). Ultimately, the Government bears the burden of proving that the taxpayer's property is held by a nominee.[13]

### 2. The Trust Holds the Apartment as Nassar's Nominee

The Court finds that the undisputed evidence demonstrates that Nassar has exercised complete control over the Apartment and has retained all the benefits of ownership, suggesting that he, not the Trust, is the true owner of the property. Indeed, application of the above-referenced six-factor test supports summary judgment in favor of the Government on the nominee claim.

With respect to the first factor, the record makes clear that the Trust paid no consideration

---

[13] The parties do not dispute, nor is it clear, whether the Government must prove that the Trust is held by Nassar's nominee by a preponderance of the evidence or clear and convincing evidence. *See Evseroff*, 2012 WL 1514860, at *10 n.16. However, because the Court finds that the government's proof satisfies either standard with regard to the Apartment and the levied bank accounts, it need decide which standard is appropriate.

for the Apartment,[14] after Nassar paid over $1.3 million for it less than three months earlier. Nassar argues that consideration was paid because Nassar "suffered the irrevocable loss of ownership . . . in order to benefit his children by creating the Trust."  However, Nassar fails to recognize that *the Trust* paid no consideration, and that of course, is the pertinent issue.

As to the second factor, there is substantial evidence that Nassar transferred the Apartment to the Trust in anticipation of civil liability and the tax liability he would incur the following year.[15]  A year before Nassar transferred the Apartment, a pharmaceutical company filed a civil suit against him.  Yet Nassar represented that he had no assets to pay any judgment. Furthermore, although Nassar's 2002 tax liability had not yet accrued, he would have been aware at the time of the transfer that he faced significant future tax liabilities, given his high income at the time.  Def. 56.1 ¶ 7 ("Between 1998 and 2001 [Nassar] had business revenues greater than $42 million with a net profit of $12 million before taxes.").  The fact that Nassar was not necessarily facing tax liability at the moment he transferred the Apartment does not negate the evidentiary significance of Nassar's anticipated liabilities.  Indeed, Nassar's assertion that the Apartment is owned by the Trust has insulated him from a range of future liabilities including his over $100,000 child support judgment, his criminal restitution, and his tax liabilities.

With regard to the third factor, the fact that Nassar is both a beneficiary and trustee of the Trust is indicative of a close relationship between Nassar and the alleged nominee.  The fourth

---

[14] Nassar suggests that the Trust paid $10 in consideration for the Apartment, Def. 56.1 ¶ 8, but nothing in the record suggests that any money was paid by the Trust.  Moreover, even if the Trust paid $10 for the United Nations Plaza Apartment, that amount would be patently inadequate.

[15] The Government suggests that at the time of the transfer, Nassar could have also anticipated his impending divorce and obligations to pay child support and alimony.  However, Nassar and Niliana were only separated at the time of the transfer.  The divorce agreement was not executed until 2013.  Though the Court found it reasonable to infer the anticipation of such liabilities at the motion to dismiss stage, the record on summary judgment is not clear on this point.

factor weighs against nominee liability, though, as the conveyance was ultimately recorded.  The

Government notes, however, that the conveyance was not recorded until three months after the

transfer and no transfer tax was paid.  Powell Decl., Ex. 17.

The fifth and sixth factors weigh most strongly in the Government's favor, as Nassar has

clearly retained possession of the Apartment, and continues to enjoy the benefits of owning the

property.  Nassar initially purchased the Apartment in his own name, and secured and paid the

mortgage loan, which was made out to him personally.  Powell Decl., Exs. 9-13.[16]  The mortgage

application itself indicated that the Apartment was going to be Nassar's residence.  Powell Decl.,

Ex. 13.  Indeed, deposition testimony of Nassar's children and the property manager of the

Apartment building demonstrate that Nassar has lived in the Apartment since moving to New

York City after his divorce.  *See* Powell Decl., Ex. 2 at 16-17, 24-26; *id.* Ex. 3 at 19-20, 24, 30,

34-35; *id.*, Ex. 4 at 29, 31-32, 34-35, 37-40.  Nassar has even acknowledged that the Apartment

has been his "primary residence" since 2008.  Powell Decl., Ex. 23 ¶ 14.  Furthermore, neither

Albert C. nor Alyse, the trust beneficiaries, have ever lived in the Apartment.  Nor has anyone

else ever lived in the Apartment, aside from Nassar's girlfriend who moved there in 2009.

Therefore, although Nassar formally transferred title to the Apartment, the transfer in no way

interfered with or limited his ability to enjoy the full benefits of owning the property.  *See*

*Berkshire Bank v. Town of Ludlow, Mass.*, 708 F.3d 249, 252 (1st Cir. 2013) (finding that "lack

of interference in taxpayer's use of property by the titleholder" is a factor to be considered in the

nominee analysis) (quoting *In re Callahan*, 442 B.R. 1, 6 n.5 (D. Mass. 2010)).

Therefore, the Court finds that on the whole, the six factors indicate that summary

---

[16] As noted earlier, although the down payment for the Apartment was paid for by a check issued from Nassar and Niliana's joint checking account, the record indicates that Nassar was primarily responsible for the purchase.

judgment is warranted on the Government's claim that Nassar transferred the Apartment to the Trust as his nominee. *See Evseroff*, 270 Fed. App'x at 77 (the critical issue in resolving a nominee claim is "control"); *Cohn*, 682 F. Supp. at 216 (noting that the government need only allege facts that show that taxpayer "possessed an ownership interest" in the property); *May*, 458 F. Supp. 2d at 1339 (granting government's summary judgment motion notwithstanding genuine issue of material fact as to whether property was transferred in anticipation of a lawsuit or other liability since "the 'ultimate inquiry' in any nominee analysis is whether the taxpayer is 'the true beneficial owner of the property'") (quoting *Spotts v. United States*, 429 F.3d 248, 253 n.2 (6th Cir. 2005)).

The Court's decision is further substantiated by the ruling in *United States v. Evseroff*, 2012 WL 1514860 (E.D.N.Y. Apr. 30, 2012). In *Evseroff*, the district court found that the Government could invoke the nominee theory to foreclose its liens against the taxpayer's home, which had been transferred to a trust purportedly created for the benefit of the taxpayer's two children. 2012 WL 1514860, at **2, 9-13. The facts in *Evseroff* are particularly analogous to the facts here: The taxpayer created the trust and transferred the property shortly thereafter in anticipation of liability to his estranged wife, *id.* at **3, 11; the taxpayer claimed the trust was created for estate planning purposes, and the taxpayer's children were to receive the property after his death, *id.* at **4, 9; the taxpayer received no consideration from the trust, *id.* at *2; the taxpayer continued to possess and reside in the property after the transfer, *id.* at **2, 11; the taxpayer remained the named beneficiary on the property's insurance policies, *id.* at *3; the taxpayer did not pay rent to the trust, *id.* at *2; the taxpayer paid the expenses associated with home ownership, including mortgage, utilities, taxes, and insurance, and the trust did not record these payments as income, *id.* at **2-3; and the trust did not assume the outstanding mortgage

after the transfer, *id.* at *3.  After applying the six-factor nominee test, the district court in *Evseroff* found that the trust held the property as the taxpayer's nominee, and permitted the Government to foreclose the property.  *Id.* at ** 11-12.

In responding to the Government's assertion of the nominee theory, Nassar merely concludes that the argument "has no merit."  Nassar Mem. at 8.  Indeed, he provides no evidence suggesting that he did not control or enjoy the benefits of owning the Apartment.  Rather, Nassar contends that "the Trust was validly formed and duly exists," relying on a declaration submitted by a trust and estates attorney who assisted in creating the Trust.  Doc. 52-1.  However, the valid creation of the Trust does not bear on whether the Trust holds the Apartment as Nassar's nominee.  Nor does Nassar's contention that the Trust was formed for "bona fide estate-tax planning purposes," because the Second Circuit has already explained that the "critical issue in resolving a nominee . . . claim is not motive, but control[.]"  *Evseroff*, 270 Fed. App'x at 77.  For this same reason, Nassar's claim that he was solvent at the time of the transfer is also unavailing.  Because the analysis focuses on control, solvency is not pertinent to the nominee analysis.  *See Evseroff*, 2012 WL 1514860, at *3 (noting that regardless of whether the taxpayer at the time of the transfer had assets valued at $76,811 or $652,115 over and above his tax liabilities, "the results of the . . . nominee . . . analys[is] would be the same").

Finally, Nassar's reliance on *United States v. Kattar*, 81 F. Supp. 2d 262 (D.N.H. 1999) is misplaced.  In *Kattar*, several properties were transferred to a trust that was created shortly after the taxpayer was indicted for tax evasion. 81 F. Supp. 2d at 264-65. The district court denied the Government's motion for summary judgment finding that there were issues of fact as to the alleged nominee status of the trust.  *Id.* at 274.  Significantly, the court found that there were "credibility issues" surrounding the extent to which the taxpayer and his spouse retained control

and possession of the premises, given that several other family members lived in the properties. *Id.* There are no such credibility issues here, however. As explained above, the undisputed evidence demonstrates that Nassar alone exercised complete control over the Apartment.

For these reasons, the Court grants the Government's motion for summary judgment in the Foreclosure Action.

### B. The Bank Account Levies

Section 7426 of the Internal Revenue Code provides "a limited statutory remedy" to third parties who claim an interest in levied property and contend a levy was wrongful. *Blue Lotus Holdings Ltd., Inc. v. United States*, No. 96 Civ. 233 (LEK), 1996 WL 679758, at *3 (N.D.N.Y. Oct. 22, 1996). "[A] levy will only be found to be wrongful when plaintiff proves that '(1) the IRS filed a levy covering taxpayer liability against property held by the plaintiff; (2) the plaintiff had an interest or lien on that property superior to the government's interest; and (3) the levy was wrongful because the tax debtor does not own the property levied against." *Id.* (quoting *LiButti v. United States*, 894 F. Supp. 589, 581 (N.D.N.Y. 1995), *vacated on other grounds*, 107 F.3d 110 (2d Cir. 1997)); *see also Taylor v. Taylor*, No. 12 Civ. 0037 (LEK), 2013 WL 1183290, at *2 (N.D.N.Y. Mar. 21, 2013) (applying same standard). Here, the Court finds that the levies were proper because the record indicates that Nassar exercised complete control over the levied Trust Chase Account and the Worldwide Accounts. On the other hand, The Trust and Worldwide only appear to have held bare legal title to these accounts as Nassar's nominees.

#### 1. The Trust Chase Account

Nassar was the sole signatory on the Trust Chase Account, and testified that no one other than him had access to it. DeSilva Decl., Ex. 15; Powell Decl., Ex. 1 at 164. Nassar himself conceded at his deposition that he has used money in the account to pay for all of his personal living expenses since he became ill in 2008, and acknowledged withdrawing approximately $200,000 from

the account from April 2009 through July 2012 alone. Powell Decl., Ex. 1 at 34-36, 207; Powell Decl. Ex. 31, ¶ 17. Nassar deposited checks into the account that were made out to him personally. DeSilva Decl. ¶ 29 & Ex. 18. Furthermore, bank records reveal that Nassar repeatedly transferred money to and from the Trust Chase Account and various other entities that he controlled. *See supra* at 7 n.10 (listing the transactions); DeSilva Decl. ¶ 28 & Ex. 14. The Court finds that this evidence sufficiently demonstrates that Nassar used the Trust Savings Account in the same manner as if it were his personal account.[17]

Meanwhile, Albert C. and Alyse have received little if anything from the Trust Chase Account, even though they are beneficiaries of the Trust. In fact, neither Albert C. nor Alyse could identify any specific payments that they had received directly from the Trust. Powell Decl., Ex. 2 at 42; Ex. 3 at 54, 64. Rather, the evidence demonstrates that Nassar was the only one who used, controlled, and benefitted from the funds held in the Trust Savings Account. Because the Court finds that the Trust held the account as Nassar's nominee, the federal tax liens attached to the account and the levy were proper.

---

[17] The Court also notes the substantial evidence that Nassar controlled not only the levied Trust Savings Account, but the other Trust accounts as well. Nassar used Trust account money to fund his business transactions, such as the $40,000 payment he made to a company that was purportedly working on a project in the Middle East. Powell Decl., Ex. 1 at 179-81, Ex. 35. Nassar labeled this transfer a loan from the Trust, but the limited amount the company repaid was paid to Nassar personally, as opposed to the Trust. Powell Decl., Ex. 1 at 179-81; DeSilva Decl., Ex. 18 at GOV 03436, 03440, 03442. Moreover, Nassar's assertion that he started relying on Trust funds to cover his own personal expenses only after he became ill in 2008 is belied by the record. Nassar produced bank records for Trust accounts pre-dating the creation of the levied account that reflect substantial sums of money moving in and out of these accounts, including transfers of funds to and from Medical Management Corp. in January and April 2005, a $190,000 check made payable to the Chicago Title Insurance Company in July 2005, a $95,000 payment to an entity called Rkr Motors, Inc. in August 2005, and payments for a Citibank Mastercard in September 2005 and August 2005. Powell Decl., Ex. 34. Correspondence with his accountants also reveals that Nassar withdrew $24,243.81 from a Trust account to purchase Miami Heat season tickets in 2006 and used Trust account funds to cover $50,000 in personal legal fees he incurred in 2006. Powell Decl., Ex. 33 at CBIZ MHM 001373, 001377, 001379. It is perhaps unsurprising then, that in an email to his accountants in 2007, Nassar stated that the Trust is currently "owed $180,000." *See id.* at CBIZ MHM 001379.

### 2. The Worldwide Accounts

The Court similarly finds that the IRS properly levied the Worldwide Accounts.  As the President and sole shareholder of Worldwide, and the sole signatory on the Accounts, Nassar had exclusive access to the Accounts' funds.  Bank records demonstrate that Nassar used hundreds of thousands of dollars in the Worldwide Accounts to cover his daily expenses, including maintenance, insurance, taxes, and utilities for the Apartment, child support, garage payments for his car, personal credit card payments, health insurance payments, meals, clothing, gifts for his girlfriend and Albert C., and a payment on his girlfriend's car.  DeSilva Decl. ¶¶ 33-35, Exs. 21-22; Powell Decl., Ex. 1 at 195-206.  Nassar also frequently deposited checks made out to him personally into the Worldwide Accounts, and has admitted that he made no effort to segregate his personal funds from company funds.  DeSilva Decl. ¶ 37 & Ex. 25; Powell Decl., Ex. 1 at 211-14.

Ultimately, Nassar has not provided any evidence that would contradict the Court's finding that Nassar treated the Worldwide Accounts as his own personal accounts.  Consequently, the Court finds that the funds in the Worldwide Accounts functionally belonged to Nassar and were properly levied.  *See LiButti*, 107 F.3d at 119-120 (noting that a taxpayer's use of a company's "funds to support his affluent lifestyle" suggested that the company was his nominee).

For these reasons, the Court holds that summary judgment in favor of the Government with respect to the Wrongful Levy Action is appropriate.

### C. Reduction of the Tax Assessments to Judgment

"The district courts of the United States at the instance of the United States shall have such jurisdiction . . . to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402(a).  Once the IRS has assessed a taxpayer's liability, the Government may proceed in district court to reduce the assessment to

judgment. *Id.* Furthermore, "[i]t is well established that the IRS's tax calculations (including calculations of interest and penalties) are presumptively valid and create a *prima facie* case of liability, such that the Government is 'entitled to have the assessment reduced to judgment unless the taxpayer overcomes the presumption by the IRS that the assessment is correct.'" *United States v. Chrein*, 368 F. Supp. 2d 278, 282 (S.D.N.Y. 2005) (quoting *Chariot Plastics, Inc. v. United States*, 28 F. Supp. 2d 874, 881 (S.D.N.Y. 1998)).

This presumption extends to the Forms 4340 generated by the IRS in this case, *see* DeSilva Decl., Exs. 3, 4, which provide the assessments made against Nassar for tax years 2002 and 2009. *See, e.g.*, *United States v. Letscher*, 83 F. Supp. 2d 367, 376 (S.D.N.Y. 1999); *Envtl. Def. Fund v. United States*, No. 91 Civ. 7232 (MGC), 1997 WL 289412, *4 (S.D.N.Y. June 2, 1997) ("Certificates of Assessments and Payments are entitled to a presumption of correctness, and the taxpayer has the burden of overcoming this presumption and proving that the assessments are erroneous."). The IRS's calculations updating the amount of Nassar's total liabilities for 2002 and 2009, *see* DeSilva Decl. ¶ 10, Exs. 5, 6, are also are entitled to a "presumption of correctness." *United States v. Mazzara*, 530 F. Supp. 1380, 1382 (D.N.J. 1982), *aff'd* 722 F.2d 736 (3d Cir. 1983) (affidavit from IRS officer detailing taxpayer's total tax liability, including interest and penalties, is "entitled to a presumption of correctness.").

Therefore, Nassar bears the burden of overcoming the presumption accorded to the IRS. *See Envtl. Def. Fund*, 1997 WL 289412, at *9. To defeat the Government's motion for summary judgment, Nassar "must not only show that the assessment is incorrect, but . . . must also prove the correct amount of the tax." *Chariot Plastics, Inc.*, 28 F. Supp. 2d at 882 (citing *United States v. Janis*, 428 U.S. 433, 440-41 (1976)). Nassar has not made any such showing here.[18]

---

[18] Nassar in fact provides no opposition in response to the Government's motion to reduce the IRS's tax assessments to judgment.

The Forms 4340 provided by the IRS indicate that, as of March 14, 2016, Nassar owed a total of $2,692,634.56 in unpaid taxes, interest, penalties, and other additions for tax years 2002 and 2009, with statutory interest continuing to accrue thereafter until the obligations are paid.  DeSilva Decl. ¶ 10.  Nassar himself has conceded that he owes the IRS approximately $2.5 million.  *See* Def. 56.1 ¶ 3.  The Court thus finds that there is no material dispute with respect to Nassar's tax liability, and the Government is entitled to summary judgment on its claim to reduce Nassar's tax assessments to judgment.

## IV.     Conclusion

For the reasons set forth above, Nassar's motion for summary judgment is DENIED.  The Government's motions for summary judgment are GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 51, 57, and close the case.

It is SO ORDERED.


Dated:     September 30, 2016
           New York, New York


Edgardo Ramos, U.S.D.J.

25